**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA ex rel. PAMELA HARTLEY and STATE OF GEORGIA ex rel. PAMELA HARTLEY,**<br><br>Relator,<br><br>v.<br><br>**THE HOSPITAL AUTHORITY OF VALDOSTA AND LOWNDES COUNTY, GEORGIA, d/b/a SOUTH GEORGIA MEDICAL CENTER and JOHN LANGDALE,**<br><br>Defendants. | Civil Action No. 7:21-CV-72 (HL) |

## ORDER

Relator Pamela Hartley brought this action on behalf of the United States of America and the State of Georgia pursuant to the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, and the Georgia False Medicaid Claims Act ("GFMCA"), O.C.G.A. § 49-4-168. Relator alleges Defendants The Hospital Authority of Valdosta and Lowndes County, Georgia, d/b/a South Georgia Medical Center ("SGMC") and John Langdale knowingly submitted false or fraudulent claims to the Government for payment. Relator further alleges Defendants retaliated against her after she confronted them about their allegedly illegal practices.

Before the Court are Defendants' motions to dismiss Relator's First Amended Complaint. (Docs. 29, 30). After considering the motions, pleadings, and applicable law, the Court **GRANTS** Defendants' motions.

## I.     BACKGROUND

In analyzing Defendants' motions to dismiss, the Court accepts all factual allegations in the Amended Complaint as true and construes them in the light most favorable to Relator.

SGMC is a comprehensive provider of medical services in South Georgia with campuses in Valdosta, Lakeland, and Nashville. (Doc. 25, ¶ 4). SGMC encompasses other related entities, including SGMC Surgery Suite, SGMC General Surgery, South Georgia Medical Center Foundation, Inc., and South Georgia Medical Center, Inc. (Id. at ¶ 5). All SGMC organizations and facilities share overlapping oversight and management. (Id.).

Defendant John W. Langdale, Jr. is the Treasurer for the Board of Directors of the Hospital Authority of Valdosta and Lowndes County, Georgia. (Id. at ¶ 6). The Board directs and manages SGMC and its affiliated hospitals, clinics, and other medical care facilities. (Id.). According to Relator, Langdale is the "ultimate authority" for board members and hospital personnel. (Id.). Langdale's family is a long-time benefactor of the hospital system. (Id.). Both broad and specific policies relating to the management of SGMC are subject to Langdale's approval, creating complete unity of purpose and interests between SGMC and Langdale. (Id.). Any failure by SGMC to operate a compliant system stems from Langdale's direction. (Id.).

2

Relator Pamela Hartley is the former Director of Revenue Cycle for SGMC. (Id. at ¶ 8). SGMC Chief Financial Officer Grant Byers tasked Relator with improving SGMC's cash flow, adjusting staff to meet the revenue cycle, and reviewing the qualifications of staff. (Id.). Seven directors reported to Relator. (Id.). In this role, Relator gained a ground-level understanding of SGMC's operations and billing practices. (Id.).

Relator filed a *qui tam* Complaint against SGMC on June 15, 2021, alleging violations of the FCA and GFMCA for presenting false or fraudulent claims to the Government for payment. (Doc. 1). Pursuant to 31 U.S.C. § 3730(b)(2), the Court placed the Complaint under seal to permit the United States and the State of Georgia an opportunity to investigate Relator's allegations and to decide whether to intervene in the action. (Doc. 3). The Court granted two extensions of the seal and the time to consider election to intervene. (Docs. 9, 12). On June 1, 2022, nearly a year after Relator filed her Complaint, the United States and the State of Georgia declined to intervene. (Docs. 14, 15). The Court unsealed the Complaint and ordered service on SGMC on June 2, 2022. (Docs. 16, 17).

SGMC received service of the Complaint on August 30, 2022. (Doc. 19, ¶ 3). The parties agreed to extend the date for SGMC to file a responsive pleading to October 19, 2022. (Id. at ¶ 6). SGMC moved to dismiss Relator's Complaint on October 18, 2022. (Doc. 20). Relator responded by filing an

3

Amended Complaint, which corrected the misnomer of SGMC and added claims against Langdale. (Doc. 24).[1] Defendants then moved to dismiss Relator's Amended Complaint for failure to state a claim on February 13, 2023. (Doc. 29, 30). Those motions are now before the Court.

### A.    Regulatory Framework

The FCA provides for an award of treble damages and civil penalties for knowingly presenting or causing to be presented false or fraudulent claims for payment to the Government; for knowingly making or using, or causing to be made or used, false records or statements material to false or fraudulent claims paid by the Government; and for knowingly and improperly avoiding an obligation. 31 U.S.C. § 3729(a)(1)(A), (B), (C), (G)).[2] The FCA additionally provides for relief from retaliatory actions. 31 U.S.C. § 3720(h).

Relator's allegations of FCA violations implicate the rules and regulations of several different Government funded health insurance programs. The Medicare Program, established under Tile XVIII of the Social Security Act, 42 U.S.C. § 1395, et seq., is a federally funded health insurance program. (Doc. 24,

---

[1] The filing of Relator's Amended Complaint rendered SGMC's motion to dismiss Relator's original complaint moot. The Court entered a text only Order denying SGMC's motion as moot on March 31, 2023. (Doc. 42).

[2] Relator asserts claims under both the FCA and the GFMCA. The statutory language of the GFMCA mirrors the language of the FCA. See Hill v. Bd. Of Regents of the Univ. Sys. of Ga., 351 Ga. App. 455, 459 (2019). Courts, therefore, "generally look to federal case law to decide issues under the GFMCA." Id. Accordingly, any ruling on Relator's FCA claims applies equally to her claims arising under the GFMCA.

¶ 10). Entitlement to Medicare is based on age, disability, or affliction with end stage renal disease. (Id.) (citing 42 U.S.C. § 426 et seq.). Part A of the Medicare Program authorizes payment for institutional care, including inpatient hospital services and post-hospital nursing facility care. (Id. at ¶ 11) (citing 42 U.S.C. §§ 1395c-1395i-4). Part B of the Medicare Program covers outpatient and ambulatory services as well as services performed by physicians and certain other health care providers, whether inpatient or outpatient. (Id. at ¶ 12) (citing 42 C.F.R. § 410.3).

Medicaid, established under Title XIX of the Social Security Act, shares funding between the Federal Government and participating states and provides certain medical services to the poor. (Id. at ¶ 14). Medicaid regulations require each state to designate a single state agency to administer Medicaid funds in accordance with the Social Security Act. (Id.). In Georgia, that agency is the Georgia Department of Community Health. (Id. at ¶ 17). Enrolled Medicaid providers agree to abide by the rules, regulations, policies, and procedures governing payment as well as to keep and to allow access to records and information as required by Medicaid. (Id. at ¶¶ 15, 18). Failure to abide by the applicable statutes and regulations disentitles a provider to payment for services rendered to a Medicaid patient. (Id. at ¶ 18).

The Federal Government administers several other health insurance programs, including TRICARE, CHAMPUS, and the Federal Employee Health

Benefits Program. (Id. at ¶ 19). TRICARE, administered by the United States Department of Defense, provides health insurance benefits to retired members of the Uniformed Services and to spouses and children of active duty, retired, and deceased members, as well as to reservists ordered to active duty for thirty days or longer. (Id. at ¶¶ 20-21). CHAMPUS, administered by the United States Department of Veterans Affairs, is a health insurance program for families of veterans entitled to permanent and total disability benefits. (Id. at ¶ 22). The Federal Employee Health Benefit Program, administered by the United States Office of Personnel Management, provides health insurance benefits to federal employees, retirees, and survivors. (Id. at ¶ 23).

## B. Factual Allegations

Relator alleges Defendants systemically ignored the regulations with which they were bound to comply. (Id. at ¶ 24). They disregarded "red flags," and "recklessly turned a blind eye to glaring deficiencies and violations" to maximize profits. (Id.). Plaintiff explains that as the Director of Revenue Cycle she was in a unique position to identify non-compliance with the various government-based insurance programs. (Id. at ¶ 27). According to Relator, Defendants violations were "across the board"—meaning Defendants' submissions to all the federal and state insurance programs were wrought with error. (Id.). Relator routinely alerted Defendants to issues of non-compliance. (Id.). Rather than alter their

6

allegedly fraudulent practices, Defendants disregarded Relator's warnings and ultimately fired her. (Id. at ¶¶ 25-26).

## 1.   False Claims

Relator alleges Defendants engaged in fifteen separate fraudulent schemes to defraud the Government in violation of the FCA:

### (a)   Failure to Document and Falsification of Records

Relator contends SGMC failed to implement and enforce a policy ensuring maintenance of records. (Id. at ¶ 28). SGMC also permitted physicians to alter records to facilitate payment. (Id.). Relator states proper documentation is a prerequisite to participation in the Medicare Program. (Id.). Thus, to the extent the treatment of any patient was not properly documented, any certification of compliance made to Medicare was false. (Id.).

### (b)   Changing Diagnosis on Denied Claims

Shortly before her termination, Relator learned that physicians at SGMC were inquiring of the IT Department how to change a diagnosis in Epic, the electronic medical records system utilized by SGMC. (Id. at ¶ 29). The physicians wanted the IT Department to create a method whereby if a claim was rejected by an insurer based on lack of medical necessity, the physician could later modify the diagnostic coding and resubmit the claim for payment. (Id.).

One such request came from the office of Dr. Griner. (Id. at ¶ 30). On July 22, 2019, Relator informed Dr. Griner's office that diagnostic codes could not be

changed and resubmitted in Epic. (Id.). The proper protocol was to appeal the denial and to include supporting documentation for the test or procedure. (Id.). Relator requested Dr. Griner's office give an example of a specific diagnostic coding change Dr. Griner wished to make. (Id.). According to Relator, the example Dr. Griner provided only asked to change a diagnostic code without any additional documentation simply because the insurance company was "not paying enough." (Id.). Relator informed Dr. Griner's office this practice was illegal. (Id.). Her position was that the initial diagnostic coding reflected the true diagnosis of a patient and that any alteration of the coding was improper and done solely for the purpose of securing payment. (Id. at ¶¶ 30-31). Relator provided a copy of her written response to Dr. Griner to Grant Byers, SGMC's CFO, David Schott, SGMC's COO, and Bill Forbes, SGMC's CEO. (Id. at ¶ 30).

(c)    Improper Billing of Infusions

The Center for Medicare and Medicaid Services ("CMS") requires providers to record the timing of infusions. (Id. at ¶ 34). Relator alleges the nursing staff at SGMC failed to document the start and stop times for infusion therapies. (Id.). Without proper documentation of when infusion therapies stopped and started, Relator contends any claim submitted for these services was inherently fraudulent. (Id.).

8

(d)     Alteration of Admission Dates

Relator alleges SGMC back-dated patient admission information. (Id. at ¶ 35). When a patient's status changed from observation to admission, SGMC staff modified the patient's records to show the date of admission as the date the patient first entered the facility for observation. (Id.). Relator alleges this practice caused several problems. First, an appropriate physician order for admission would not align with the date of admission. (Id.). Second, alteration of the dates caused errors in the Epic system and frequently resulted in duplicated billing for medications. (Id. at ¶ 36). This practice of back-dating patient admissions had been in effect at SGMC for at least ten years. (Id.).

(e)     Improper Classification of Youth Care Clinic and Labor and Delivery as Emergency Departments

SGMC operates a Youth Care Clinic Monday through Friday from 5:30 p.m. to 8:30 p.m. and Saturday and Sunday from 9:30 a.m. to 4:30 p.m. (Id. at ¶ 37). Local pediatricians, who wanted to limit their on-call hours by establishing a rotation of available physicians, worked with SGMC to create this clinic. (Id.). SGMC's billing system classified services rendered by the clinic as Emergency Department ("ED") services. (Id.). Relator alleges this billing practice resulted in improper overbilling for services performed at the clinic. (Id.). Relator alleges SGMC also improperly billed Labor and Delivery services as ED services. (Id. at ¶ 38).

9

(f)   Improper Physician Billing

Federal regulations require hospitals to "use a system of author identification and record maintenance that ensures the integrity of the authentification and protects the security of all record entries." (Id. at ¶ 39) (quoting 42 C.F.R. § 482.24(b)). Relator alleges SGMC failed to implement controls for who signed orders and medical records. (Id.). SGMC hired a consultant to examine physician documentation as well as charging and billing practices. (Id. at ¶ 40). The consultant scheduled training sessions for SGMC physicians to address the issues she identified. (Id.). The physicians did not attend the training, and many refused to change their practices. (Id.). Dr. Randall Brown and Dr. Joe Johnson are two physicians who refused to cooperate with the consultant. (Id. at ¶ 41). SGMC enabled the improper billing practices of these physicians, going so far as to request that their physician signature requirements be disabled in Epic. (Id.).

(g)   Billing for Services of Unassociated Physicians

SGMC's CFO Grant Byers identified twenty-five medical providers, including gastroenterologists and an orthopedic clinic, who were not employed by SGMC but for whom SGMC provided authorizations.[3] (Id. at ¶¶ 42-43). Byers, at the request of Relator, recommended SGMC discontinue issuing the

---

[3] The purpose of these authorizations is not clear from the Amended Complaint. It is also not clear how the authorizations pertain to billing for services.

authorizations. (Id.). SGMC rejected the recommendation as SGMC intended to acquire most of those twenty-five providers and did not want to jeopardize any future employment offers. (Id. at ¶ 44).

> (h)  Improper Coding of Services Performed Outside the Hospital

SGMC experienced extensive issues with appropriately identifying the place of service. (Id. at ¶ 45). There is a difference in billing for procedures conducted in a physician's office versus the hospital. (Id.). The reimbursement rate for an office visit generally is higher than for the same procedure conducted at the hospital. (Id.). SGMC also had issues with billing for services performed in Urgent Care. (Id.). Relator flagged these issues, but SGMC was slow to correct the problems identified or ignored them altogether. (Id.).

> (i)  Non-Compliant Outpatient Orders

Medicare requires written, signed, and dated orders. (Id. at ¶ 46). Relator alleges SGMC failed to abide by this requirement when it allowed registrars to accept verbal rather than written orders from physicians. (Id.). Relator contends registrars are not qualified to take verbal orders. (Id.). Relator further alleges Medicare paid claims for tests and procedures performed without signed orders. (Id. at ¶ 47). Relator maintains any claim submitted to Medicare for services rendered pursuant to a verbal instead of a written order violated the FCA. (Id.).

(j)      Improper Verification of Inpatient Status

SGMC's Bed Planning Department routinely accepted verbal admission orders from physicians for direct admissions and for transfers from other facilities. (Id. at ¶ 48). A nurse explained to Relator that her practice was to write a paper order and send it to the registration department. (Id.). Generally, though SGMC had no process for ensuring the order was signed by the admitting physician or that the order was included in the patient's medical record prior to discharge as required by 42 C.F.R. § 482.24. (Id. at ¶¶ 48-49).

(k)      Upcoding of Emergency Department Charges

Relator learned at a meeting in late 2018 that there was an error in Epic causing miscoding of ED level services. (Id. at ¶ 50). When caught, medical record department coders would correct any errors. (Id.). Otherwise, there was no policy or process in place to identify problematic accounts. (Id.). Relator alleges SGMC knew about this problem but did nothing to correct the issue in Epic. (Id.).

(l)      Improper Laboratory Billing

SGMC operated a laboratory with courier services available to various physicians. (Id. at ¶ 51). The laboratory categorized services into two types of accounts: specimen accounts and outpatient accounts. (Id.). Relator states SGMC's lab manager contacted her after receiving complaints from physicians that SGMC was misidentifying accounts. (Id.). Relator alleges that by

categorizing accounts as outpatient accounts rather than specimen accounts, SGMC could receive a fee for each specimen collected. (Id.).

(m)     Improper Billing for Inpatient Procedures

In early 2019, Relator learned that nurses on the inpatient floors were signing off on orders for services that were never performed. (Id. at ¶ 55). When physicians place orders in Epic, the orders remain listed as open until the orders are either completed or cancelled. (Id.). Relator's observation was that upon discharge, the nurses would go through the list of open orders and mark them as complete without verifying whether the service was performed. (Id.). This practice resulted in overbilling of patient accounts. (Id.).

(n)     Improper Billing for EKSs

Relator alleges that as a result of a deficiency in the billing software utilized by SGMC, SGMC was overbilling for EKG services. (Id. at ¶ 56). Relator further alleges that the nursing staff closed EKG orders during patient discharge without verifying whether the EKG was performed. (Id.). Closing the EKG order automatically resulted in a charge for the procedure. (Id.). Relator states, "SGMC was well aware of this deficiency as the problematic design of the billing software interface caused charging issues and resulted in several large rebilling projects." (Id.). But Relator also claims SGMC never took steps to repay funds received for unperformed services. (Id.).

13

(o)     Inaccurate System for Inputting Surgical Procedures

Relator claims SGMC surgeons failed to familiarize themselves with Epic prior to ordering procedures. Unable to find a procedure listed in the software, surgeons would select something similar. This practice resulted in inaccurate billing. (Id. at ¶ 57).

### 2.     Reverse False Claim

Providers who receive funds to which they are not entitled owe an affirmative duty under Medicare regulations to notify Medicare and to repay the overpaid sums within sixty days. (Id. at ¶ 58). Relator alleges Defendants never notified nor repaid any funds to Medicare relating to any of the areas of noncompliance identified by Relator. (Id.).

### 3.     Retaliation

On September 13, 2019, CFO Grant Byers informed Relator of SGMC's decision to terminate her. (Id. at ¶ 59). Byers praised Relator's knowledge and skill and expressed his appreciation for the work she had done for SGMC. (Id.). Leticia Woods, SGMC's HR Director, reviewed part of the separation agreement with Relator and explained Relator had twenty-one days to accept the terms. (Id. at ¶ 60). Woods provided no other information about SGMC's decision to terminate Relator. (Id.). Security escorted Relator out of the building. (Id.). Relator returned a couple of weeks later to collect her personal belongings. (Id. at ¶ 61). Security examined the items Relator gathered, including her personal

14

notebooks, from which Security required Relator extract any pages containing writing. (Id.).

Relator is not aware of any complaints about her management style while employed by SGMC. (Id. at ¶ 65). However, she knows several physicians, including Dr. Griner, were displeased with the practices and policies Relator implemented. (Id.). Relator believes she angered Dr. Griner when she informed him that altering diagnosis codes after submission of a bill was illegal. (Id. at ¶ 66). Dr. Griner is a member of SGMC's Board. (Id.).

Relator contends her termination was in retaliation for alerting SGMC that their policies and practices violated the law. Relator states she had an objectively reasonable belief based on her high-level position in compliance and finance that Defendants "were in the course of, or were about to, violate the False Claims Act." (Id. at ¶ 67). She alleges she acted to prevent any violations, that Defendants were aware that she was engaging in a protected activity, and that she was terminated in retaliation for her consistent insistence that SGMC act in compliance with the law. (Id.).

## II.   LEGAL STANDARD

On a motion to dismiss, the Court must accept as true all well-pleaded facts in a plaintiff's complaint. Sinaltrainal v. Coca-Cola Co., 578 F.3d 1252, 1260 (11th Cir. 2009).  To avoid dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to

'state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). A claim is plausible where the plaintiff alleges factual content that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u> The plausibility standard requires that a plaintiff allege sufficient facts "to raise a reasonable expectation that discovery will reveal evidence" that supports a plaintiff's claims. <u>Twombly</u>, 550 U.S. at 556.

Federal Rule of Civil Procedure 8(a)(2) requires a complaint include "a short and plain statement of the claim showing that the pleader is entitled to relief." When, as here, a complaint asserts allegations of fraud or mistake, Rule 9(b) requires a heightened pleading standard. <u>See</u> <u>Hopper v. Solvay Pharm., Inc.</u>, 588 F.3d 1318, 1324 (11th Cir. 2009) (applying Rule 9(b) to causes of action brought under the FCA). Under Rule 9(b), when "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). To meet this standard, a party seeking relief under the FCA must plead not only the "who, what, where, when, and how of improper practices," but also the "who, what, where, when, and how of fraudulent submissions to the Government." <u>Corsello v. Lincare, Inc.</u>, 428 F.3d 1008, 1014 (11th Cir. 2005) (citation omitted). Rule 9(b) serves to ensure that a FCA claim has "some indicia of reliability . . . to support the allegation of an

16

actual false claim for payment being made to the Government." <u>United States ex rel. Clausen v. Lab. Corp. of Am., Inc.</u>, 290 F.3d 1301, 1313 n.24 (11th Cir. 2002).

## III. DISCUSSION

### A. SGMC'S MOTION FOR SUMMARY JUDGMENT

#### 1. Submission of False or Fraudulent Claim

In Count One of her Amended Complaint, Relator alleges SGMC violated 31 U.S.C. § 3729(a)(1)(A) by knowingly presenting, or causing to be presented, false claims to the Government for payment. SGMC moves to dismiss Count One of Relator's Amended Complaint, arguing that Relator has failed to allege the submission of a false claim with particularity as required by Rule 9(b).[4]

The FCA imposes liability on any person who "knowingly presents or causes to be presented a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). The "act of submitting a fraudulent claim to the [G]overnment is the *sine qua non* of a [FCA] violation." <u>Corsello</u>, 428 F.3d at 1012 (quotation and citation omitted). "Without the *presentment* of such a claim, while the practices of an entity that provides services to the Government may be unwise or improper, there is simply no actionable damage to the public fisc as required" under the FCA. <u>Clausen</u>, 290 F.3d at 1311 (emphasis in original). To

---

[4] Both Relator and SGMC address Relator's false submission, false statement, and reverse false claims collectively. For the sake of clarity, the Court discusses each claim individually.

state a false submission claim, a complaint accordingly must allege "(1) a false claim, (2) that the defendant presented, for payment or approval, (3) with knowledge that the claim was false." United States ex rel. 84Partners, LLC v. Nuflo, Inc., 79 F.4th 1353, 1359 (11th Cir. 2023).

A complaint asserting a FCA false submission claim must also meet the heightened pleading standard of Rule 9(b). See Estate of Helmly v. Bethany Hospice and Palliative Care of Coastal Ga., 853 F. App'x 496, 501 (11th Cir. 2021) (citing Corsello, 428 F.3d at 1012; United States ex rel. Atkins v. McInteer, 470 F.3d 1350, 1357 (11th Cir. 2006)). To satisfy Rule 9(b), a relator must "allege the 'who,' 'what,' 'where,' 'when,' and 'how' of fraudulent submissions to the [G]overnment." Corsello, 428 F.3d at 1014. Rule 9(b) serves two purposes. The first purpose is to "alert[ ] defendants to the precise misconduct with which they are charged and [to] protect[ ] defendants against spurious charges of immoral and fraudulent behavior." Clausen, 290 F.3d at 1310. The second purpose is to ensure "that the relator's strong financial incentive to bring an FCA claim . . . does not precipitate the filing of frivolous suits." United States ex rel. Atkins v. McInteer, 480 F.3d 1350, 1360 (11th Cir. 2006).

Relator's false submission claim fails because Relator has not pled SGMC presented any claim to the Government with the necessary particularity. Absent from Relator's Amended Complaint are essential details, including when SGMC made any alleged false submissions, who made the false submissions, the

nature of the false submissions, and to whom the false submissions were made. For example, Relator makes conclusory statements that SGMC misclassified services performed at the Youth Care Clinic and the Labor and Delivery Department as Emergency Department services. (Doc. 24, ¶¶ 37-38). Relator states this misclassification resulted in overbilling for services performed by these providers. (Id.). Relator also alleges SGMC backdated patient admissions, resulting in duplicated billing for medications (Id. at ¶ 36); mischaracterized the place of service for procedures to ensure a higher rate of payment (Id. at ¶ 45); misidentified laboratory specimens to receive a higher fee (Id. at ¶ 51); billed for services hospital staff did not first confirm were performed (Id. at ¶¶ 55-56). Missing from each of these claims of false submission is any information which would alert SGMC to any specific bill Relator contends was falsely submitted for payment. Relator does not state, for example, the name of the patient who received care at SGMC, when that patient received care, the nature of the care received, which SGMC provider rendered services to the patient, the services for which SGMC submitted a bill for that patient's care, who submitted the bill for payment, when the bill was submitted, what aspect of the bill was false, or what SGMC received as a result. Relator states only that SGMC's deficient practices could, or likely did, result in fraudulent billing.

Relator also fails to allege to whom SGMC submitted any bill for payment. In the introductory paragraphs of her Amended Compliant, Relator names the

19

primary Government funded health insurers, i.e., Medicare, Medicaid, Tricare, Champus, and the Federal Health Employee Benefit Program. However, most of Relator's allegations of fraudulent billing neglect to differentiate between SGMC's billing to any of these entities. She instead generally alleges SGMC tendered bills for payment to which SGMC knew it was not entitled. The implication is that every bill submitted to every insurer for every service rendered by any SGMC provider was fraudulent. Such conclusory statements fall far short of meeting the heightened pleading requirements of Rule 9(b).

Relator does mention Medicare and Medicaid in relation to a few of her claims of false presentment. For example, in Paragraph 28 of her Amended Complaint, Relator alleges SGMC failed to implement a policy ensuring providers maintained adequate records as required by Medicare. (Doc. 24, ¶ 28). Relator claims improper documentation resulted in falsified claims to Medicare for payment of these services. (Id.). Similarly, in Paragraph 34, Relator alleges the Center for Medicare and Medicaid requires qualifying providers record the timing of infusions. (Id. at ¶ 34). According to Relator, SGMC nurses did not document the start and stop times for infusions; therefore, any bill submitted to Medicare or Medicaid for infusion therapies was false. (Id.). Then, in Paragraph 46, Relator alleges SGMC submitted bills to Medicare stemming from oral orders given to non-qualifying staff members, which is not permitted by Medicare. (Id. at ¶ 46).

Relator contends those bills were fraudulent because there was no written documentation for the orders. (Id.).

While Relator identifies the Government agency to whom SGMC directed its bills in these limited instances, Relator still does not outline when the bills were submitted, who submitted the bills, the types of services for which SGMC sought payment, or who performed the services. In short, Plaintiff has failed to plead facts adequate to place SGMC on notice of the claims asserted against it.

Relator's Amended Complaint primarily demonstrates SGMC's poor record keeping and negligent adherence to Government regulations. Relator alleges SGMC failed to ensure proper maintenance of records (Doc. 24, ¶¶ 28, 46, 48); did not properly train physicians on how to enter data into the electronic medical records system and permitted physicians to alter information to change diagnostic coding (Id. at ¶¶ 29, 39); and altered dates of service (Id. at ¶ 35). But liability under the FCA does not attach "merely for a health care provider's disregard of Government regulations or improper internal policies unless, as a result of such acts, the provider knowingly asks the Government to pay amounts it does not owe." Clausen, 290 F.3d at 1311. In other words, SGMC's alleged improper practices standing alone are not enough to state a claim under the FCA for false submission. There must be allegations beyond Relator's summary conclusion that as a result of those poor practices, SGMC knowingly requested

payment from the Government. See Clausen, 290 F.3d at 1311. Relator's Amended Complaint lacks these crucial details.

Relator maintains any deficiency in her pleadings is overcome by the nature of her employment at SGMC. In Clausen, the Eleventh Circuit emphasized "if Rule 9(b) is to be adhered to, some indicia of reliability must be given in the complaint to support the allegation of *an actual false claim* for payment being made to the Government." Id. (emphasis in original). Clausen "has been read to hold that the minimum indicia of reliability required to satisfy Rule 9 are the specific contents of actual claims;" but such specifics are not always needed to overcome a motion to dismiss. United States ex rel. Willis v. Angels of Hope Hospice, Inc., No. 5:11-CV-041 (MTT), 2014 WL 684657, at *7 (M.D. Ga. Feb. 21, 2014); see also 84Partners, 79 F.4th at 1361 (affirming that attaching a copy of a bill is not always required).

In Hill v. Morehouse Med. Assoc., for example, the Eleventh Circuit distinguished the pleading requirements imposed on a corporate outsider, who provides no factual basis for the conclusion that false bills were submitted to the Government, versus an employee of the defendant, who offers a firsthand account of the defendant's specific fraudulent conduct. 2003 WL 22019936, at *4 (11th Cir. Aug. 15, 2003). The Eleventh Circuit accordingly signaled that a more relaxed pleading standard may be applied when the relator "witnessed firsthand the alleged fraudulent submissions" thereby providing "the indicia of reliability

22

that is necessary in a complaint alleging a fraudulent billing scheme." Id. at *5; see also United States ex rel. Walker v. R & F Prop. of Lake Cnty., Inc., 433 F.3d 1349, 1360 (affirming denial of motion to dismiss where the complaint identified the relator as an employee of the defendant and asserted allegations sufficient to explain why the employee believed the defendant submitted false or fraudulent claims). Several years later, the Eleventh Circuit again emphasized tolerance "toward complaints that leave out some particularities of the submissions of a false claim if the complaint also alleges personal knowledge or participation in the fraudulent conduct." United States ex rel. Matheny v. Medco Health Sol., Inc., 671 F.3d 1217, 1230 (11th Cir. 2012). In short, "whether the allegations of a complaint contain sufficient indicia of reliability to satisfy Rule 9(b)" must be evaluated on a case-by-case basis. McInteer, 470 F.3d at 1358.

Relator argues "her allegations are inherently adequate by virtue of her position at SGMC" which placed her "in close contact with these fraudulent schemes and directly in charge of billing and revenue. (Doc. 37, p. 9). She further claims she "was fully aware that claims were actually being made to the government, either for services that were rendered improperly, for services that were never provided at all, or at a higher rate than was justified based on what was provided." (Id.). How Relator gained this awareness is not clear from her Amended Complaint.

23

Relator describes her position at SGMC as follows:

Relator Pamela Hartley was the former Director of Revenue Cycle for SGMC. Upon joining SGMC, Relator quickly realized that SGMC was being poorly managed both financially and with regard to compliance. Relator was hired by SGMC Chief Financial Officer, Grant Byers, who tasked her with improving SGMC's cash flow, right sizing the staff in the revenue cycle, and reviewing the staff to determine if they were appropriate and qualified for their positions. Much of her work concerned the billing for the false claims described herein at some level. Seven directors reported to her in this role. . . . As a result, Relator developed a ground-level understanding of SGMC's operations and billing practices and was able to witness policies and practices that led her to conclude that SGMC was violating the False Claims Act.

(Doc. 24 ¶ 8).

What duties Relator performed on a daily basis while employed by SGMC is not evident from the Amended Complaint. Interspersed throughout the Amended Complaint are statements suggesting Relator was responsible for implementing policies and procedures designed to prevent fraud and to increase revenue. She interfaced with both the IT department and the billing department in this regard. But nowhere in her Amended Complaint does Relator allege direct involvement in the billing process. She also does not allege any basis for her opinions that diagnoses and medical procedures were being miscoded and submitted for payment or that bills were being submitted for unperformed or improperly performed services. She further alleges no personal involvement in the submission of a false claim. Relator's Amended Complaint accordingly

establishes no reliable basis for Relator's assertion that SGMC submitted false claims for payment to the Government.

The Court therefore finds Relator's Amended Complaint fails to allege the actual presentation or payment of a false claim. The Court **GRANTS** SGMC's motion to dismiss Count One of Relator's Amended Complaint.

### 2.    False Statements

Relator alleges in Count Two of her Amended Complaint that SGMC knowingly made or used false records to procure payment from the Government. Relator's false statements claim fails because Relator has not adequately alleged that SGMC knowingly made any false statement for the purpose of getting a false claim paid by the Government or that any allegedly false statement was material to the false claim.

To state a claim under § 3729(a)(1)(B), a relator must show that: "(1) the defendant made (or caused to be made) a false statement, (2) the defendant knew it to be false, and (3) the statement was material to a false claim." United States ex rel. Phalp v. Lincare Holdings, Inc., 857 F.3d 1148, 1154 (11th Cir. 2017). What § 3729(a)(1)(B) "demands is not proof that the defendant caused a false record or statement to be presented or submitted to the Government but that the defendant made a false record or statement for the purpose of getting a false or fraudulent claim paid or approved by the Government." Allison Engine Co., Inc. v. United States ex rel. Sanders, 553 U.S. 662, 671 (2008) (internal

quotation marks omitted). If a defendant makes a false statement but does not intend the Government to rely on that false statement "as a condition of payment, the statement is not made with the purpose of inducing payment of a false claim" by the Government, and there is no FCA violation. Id.

Relator's Amended Complaint contains numerous generalized allegations that SGMC failed to maintain proper records and improperly documented or coded certain treatments and services. But Relator points to no readily identifiable documents or records Relators alleges are false. Nor does Relator assert any personal knowledge that any of these records were overtly false or that SGMC made any false record for the purpose of procuring payment from the Government. Relator's false statement claim therefore fails to satisfy Rule 9(b) and is subject to dismissal. The Court **GRANTS** SGMC's motion to dismiss Count Two of Relator's Amended Complaint.

### 3.   Reverse False Claim

Count Three of Relator's Amended Complaint sets forth a claim under § 3729(a)(1)(G) of the FCA for reverse false claims. Relator alleges SGMC knowingly concealed or knowingly and improperly avoided an obligation to reimburse the Government for payments SGMC received following the submission of false claims. The FCA imposes liability on "any person who . . . knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the

Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). "This is known as the 'reverse false claim' provision of the FCA because liability results from avoiding the payment of money due to the government, as opposed to submitting to the government a false claim." Matheny, 671 F.3d at 1222 (citation omitted).

"To establish a reverse false claim, a relator must prove: (1) a false record or statement; (2) the defendant's knowledge of the falsity; (3) that the defendant made, used, or causes to be made or used a false statement or record; (4) for the purpose to conceal, avoid, or decrease an obligation to pay money to the government; and (5) the materiality of the misrepresentation." Id. (citations omitted).

As discussed, Relator's Amended Complaint fails adequately to allege that SGMC falsely submitted any claim for payment to the Government. Absent allegations sufficient to establish SGMC received payment for any false claim, Relator's claim that SGMC defrauded the Government by not reimbursing the Government for any overpayment likewise fails. The Court accordingly **GRANTS** SGMC's motion to dismiss Count Three of Relator's Amended Complaint.

### 4.    Retaliation

Relator alleges in Count Four of her Amended Complaint that SGMC terminated her in retaliation for her efforts to report and prevent fraud. SGMC

27

moves to dismiss Relator's retaliation claim, arguing that (1) Relator has not properly pled that she engaged in statutorily protected activity; and (2) Relator has not established a causal link between any protected activity and her termination.

The FCA "protects employees who are targeted by their employers after they seek to prevent a violation of the Act." Hickman v. Spirit of Athens, Ala., Inc., 985 F.3d 1284, 1286 (11th Cir. 2021) (citing 31 U.S.C. § 3720(h)(1)). To state a claim of retaliation, a plaintiff must allege three essential elements: "(1) she engaged in statutorily protected activity, (2) an adverse employment action occurred, and (3) the adverse action was causally related to the plaintiff's protected activities." Simon ex rel. Fla. Rehab. Assocs., PLLC v. Heathsouth of Sarasota L.P., 2022 WL 3910607, at *5 (11th Cir. Aug. 31, 2022) (quoting Little v. United Techs., Carrier Transicold Div., 103 F.3d 956, 959 (11th Cir. 1997)).

Relator's retaliation claim fails at the first prong. The FCA prohibits any person from "knowingly present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). The FCA retaliation provision protects employees, like Relator, from being targeted for (1) "lawful acts done . . . in furtherance of an action under [the FCA]" or (2) "other efforts to stop [one] or more violations of this subchapter." 31 U.S.C. §

3730(h)(1); <u>see also</u> <u>Hickman</u>, 985 F.3d at 1288.[5] Relator alleges her protected activity falls within the second category.

The Eleventh Circuit has not explicitly adopted a test for what constitutes an effort to stop a FCA violation. <u>See</u> <u>id.</u>; <u>see also</u> <u>Simon</u>, 2022 WL 3910607 at *5. The Eleventh Circuit has assumed without deciding that a plaintiff "who argues that her conduct was in the form of 'other efforts' to stop a FCA violation must at least show that she had an objectively reasonable belief that her employer violated the FCA to establish that she engaged in protected activity." <u>Simon</u>, 2022 WL 3910607 at *6 (citing <u>Hickman</u>, 985 F.3d at 1289). Both parties here apply the objective reasonableness standard. The Court follows their lead.

The Eleventh Circuit described what an objectively reasonable belief looks like in <u>Hickman</u>:

> [Employees are] at a minimum, required to show that the activity they were fired over had something to do with the False Claims Act—or at least that a reasonable person might have thought so. And the False Claims Act requires a false claim; general allegations of fraud are not enough. After all, liability under the Act arises from the submission of a fraudulent claim to the government, not the disregard of government regulations or failure to maintain proper internal procedures.

---

[5] The Eleventh Circuit interpreted a previous version of § 3730(h) to protect "an employee from retaliation where there was at least 'a distinct possibility' of litigation under the False Claims Act at the time of the employee's actions." <u>United States ex rel. Sanchez v. Lymphatx, Inc.</u>, 596 F.3d 1300, 1303, (11th Cir. 2010). Congress amended the statute in 2009 and 2010 to extend coverage to "at least some set of people who make 'efforts to stop' False Claims Act violations," even if those efforts are not taken in furtherance of a False Claims Act lawsuit. <u>Hickman</u>, 985 F.3d at 1288.

> That requirement matters. An organization might commit, and its employees might believe it has committed, any number of legal or ethical violations—but the Act's retaliation provision only protects employees where the suspected misdeeds are a violation of the False Claims Act, not just general principles of ethics and fair dealing. It is not enough for an employee to suspect fraud; it is not even enough to suspect misuse of federal funds. In order to file under the False Claims Act, whether in a qui tam or a retaliation claim, an employee must suspect that her employer has made a false claim to the federal government.

985 F.3d at 1289 (internal citations and quotations omitted).

Relator alleges broadly that she "had an objectively reasonable belief based on her high-level position . . . that [SGMC was] in the course of, or [was] about to, violate the False Claims Act." (Doc. 24, ¶ 67). She further maintains that her "complaints about improper practices and implementation of compliant practices were done in attempt to stop these violations." (Id.). Relator specifically highlights her July 2019 interaction with Dr. Griner. (Id. at ¶ 59). Relator alleges Dr. Griner's office contacted her to inquire how to change diagnostic codes in Epic. (Id. at ¶ 30). Relator requested Dr. Griner's office provide an example of what sort of changes Dr. Griner wished to make. (Id.). Dr. Griner's office replied that the doctor wanted SGMC to permit him to alter a diagnostic code so that he could refile a claim "because insurance was 'not paying enough.'" (Id.). Relator responded by email on July 29, 2019, explaining "that diagnoses on orders for tests cannot be changed and resubmitted via Epic when denied." (Id.). Relator expressed her opinion that such practices were illegal. (Id.). She stated the

proper procedure was to appeal the denial of a claim and provide additional supporting documentation for the claim. (Id.).

Relator believes her response angered Dr. Griner. (Id. at ¶ 66). Others at SGMC told Relator "that she was set at SGMC so long as she had Dr. Griner on her side." (Id. at ¶ 66 n. 1). SGMC notified Relator of her termination on September 13, 2019, less than seven weeks following her interaction with Dr. Griner. (Id. at ¶ 59). Relator alleges that the "only thing that happened before [her] termination was that certain doctors had expressed frustration over changes Relator had made. . . . It was after this uptick in resistance to Relator's attempts to get SGMC to comply with the False Claims Act and related laws, rules, and regulations that Relator was terminated." (Id. at ¶ 65).

The allegations in Relator's Amended Complaint are not sufficient to establish an objectively reasonable belief that SGMC was submitting false claims to the Government. Relator outlines her subjective belief that Dr. Griner desired a means by which to alter diagnostic codes in SGMC's electronic medical records system to ensure a higher rate of reimbursement from insurance companies—a practice Relator thought improper. But nowhere in her Amended Complaint does Relator allege that Dr. Griner, or any other SGMC physician, submitted a claim for payment to any Government insurer or that the claim for services was based on a falsified diagnosis. Relator alleges only that Dr. Griner wished to change a diagnostic code, not that the coding was for a procedure or service that was not

provided or was provided improperly. She thus has not established that she acted to prevent a violation of the FCA.

Moreover, as SGMC states, resubmission of a claim for payment is not illegal and cannot form the basis of a fraud claim under the FCA. SGMC points to the Medicare Claims Processing Manual, which provides, "[c]laims which are rejected by the Medicare contractor or are returned to the provider . . . can be corrected and re-submitted." Medicare Claims Processing Manual Ch. 1, § 60.1. Accordingly, a provider may correct and resubmit a claim to include missing, incomplete, or contradictory information. Providers alternatively may appeal a denied claim and include additional information supported by the medical record. See id. § 70.2.3.2. Consequently, Relator's opinion that Dr. Griner's conduct was illegal is not supported by the applicable regulations and cannot form the basis of an objectively reasonable belief that she was acting to prevent a false claim.

In her response to SGMC's motion to dismiss, Relator states she alerted SGMC of potential improprieties and the potential for fraud in other aspects of SGMC's operations. (Doc. 37, p. 22). She claims she informed SGMC of improper billing for Emergency Department services; advised SGMC that nurses were impermissibly signing off on procedures; and raised concerns about the legality of providing authorizations to non-employee physicians. (Id.). At no point in her Amended Complaint, however, does Relator tie these additional allegations of purported protected activity to her termination. Even if Relator did

32

allege that this conduct contributed to her termination, Relator has not sufficiently alleged an objectively reasonable belief that any of the conduct she allegedly reported or sought to prevent rose to the level of a FCA violation.

Relator's Amended Complaint accordingly fails to set forth a prima facie case of retaliation under the FCA. The Court therefore **GRANTS** SGMC's motion to dismiss Count Four of Relator's Amended Complaint.

### B.    LANGDALE'S MOTION TO DISMISS

Defendant John Langdale filed a separate motion to dismiss. (Doc. 30). Langdale moves to dismiss Relator's Amended Complaint arguing that (1) Relator failed to allege with particularity that Langdale knowingly violated the FCA; and (2) Relator failed to allege Langdale was Relator's employer or that he was in any way involved in her termination. For the following reasons, the Court **GRANTS** Langdale's motion to dismiss.

### 1.    FCA Violations

Langdale moves to dismiss Relator's FCA claims asserted against him individually. Langdale argues Relator's Amended Complaint fails to establish with particularity that he is responsible for any FCA violation committed by SGMC. The Court agrees.

Relator's Amended Complaint contains very limited allegations concerning Langdale. Relator states Langdale is the Treasurer for the Board of Directors of SGMC. (Doc. 24, ¶ 6). But Relator contends Langdale's authority extends

beyond the Board. She claims Langdale "is the ultimate authority" and that "other board members and hospital personnel are beholden to him" because "his family has long been benefactors to the hospital." (Id.). According to Relator, SGMC's "broad policies, and many more specific policies, both in management of the company and the provision of medical care, are subject to Mr. Langdale's approval." (Id.). Relator claims the actions of SGMC and its employees therefore are "a direct result of Mr. Langdale's management and control over the various practices." (Id.). Thus, Relator concludes Langdale ultimately is responsible for causing the submission of every false claim described within her Amended Complaint. Such a broad, sweeping assertion of liability is not sufficient to meet Rule 9(b)'s heightened pleading requirements for an FCA claim.

The FCA imposes liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or "knowingly makes, uses, or causes to be made or used, a false record or fraudulent statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A)-(B). The FCA does not directly define the contours of an individual's liability for causing the submission of a false claim. See United States ex rel. Silva v. VICI Mktg., LLC, 361 F. Supp. 3d 1245, 1253 (M.D. Fla. 2019) (citing United States v. Berkeley Hearlab, Inc., 225 F. Supp. 3d 487, 499 (D.S.C.)). However, courts have applied traditional concepts of proximate causation "to determine whether there is a sufficient nexus between the

[d]efendant's conduct and the ultimate presentation of the allegedly false claim."

United States ex rel. Schiff v. Marder, 208 F. Supp. 3d 1296, 1312 (S.D. Fla.

2016) (quoting United States v. Abbot Labs., No. 3:06-CV-1769-M, 2016 WL

8000, at *6 (N.D. Tex. Jan. 7, 2016) (citing omitted)); see also Ruckh v. Salus

Rehabilitation, LLC, 963 F.3d 1089, 1106-07 (11th Cir. 2020) (adopting the

standard articulated in Marder, stating, "We find for 'cause to be presented'

claims, proximate causation is a useful and appropriate standard by which to

determine whether there is a sufficient nexus between the defendant's conduct

and the submission of a false claim."). The court in Marder noted,

> a defendant's conduct may be found to have caused the submission
> of a claim for Medicare reimbursement if the conduct was (1) a
> substantial factor in inducing providers to submit claims for
> reimbursement, and (2) if the submission of claims for
> reimbursement was reasonably foreseeable or anticipated as a
> natural consequence of [d]efendant's conduct.

208 F. Supp. 3d at 1312-12 (citation and quotations omitted).

Relator's conclusory assertions that Langdale caused SGMC's violations

of the FCA, without more, are not enough to meet the stringent pleading

requirements of Rule 9(b). Relator's Amended Complaint contains no allegations

establishing how, what, when, or where Langdale caused any FCA violation.

Corsello, 428 F.3d at 1014. Absent more specific detail concerning Langdale's

involvement in SGMC's submission of claims, Relator cannot establish the

requisite proximate cause to proceed against Langdale. The Court therefore

**GRANTS** Langdale's motion to dismiss Relator's FCA claims asserted against him individually.

### 2.  Retaliation

The FCA provides protection for any employee who is

discharged, demoted, suspended, threatened, harassed, or in any manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h)(1). It is well established that a § 3730(h) retaliation claim may only be brought against an employer. See United States ex rel Aquino v. Univ. of Miami, 250 F. Supp. 3d 1319, 1335 (S.D. Fla. 2017); De-Chu Christopher Tang v. Vaxin, Inc., 2015 WL 1487063, at *6 (N.D. Ala. March 31, 2015). Langdale argues, and Relator does not dispute, that Langdale was not Relator's employer. The Court accordingly **GRANTS** Relator's motion to dismiss Relator's retaliation claim.

## IV.  CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' Motions to Dismiss (Docs. 29, 30).

**SO ORDERED** this 12th day of October, 2023.

_s/ Hugh Lawson_____
**HUGH LAWSON, SENIOR JUDGE**